IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 18-cv-1225

RUTHIE JORDAN,
MARY PATRICIA GRAHAM-KELLY, and
COLORADO CROSS-DISABILITY COALITION, a Colorado Nonprofit Corporation,

      Plaintiffs,

v.

JEFF SHRADER, in his official capacity as the Sheriff of Jefferson County, Colorado,
PATRICK FIRMAN, in his official capacity as the Sheriff of the City and County of
      Denver, Colorado, and
CITY AND COUNTY OF DENVER, INCLUDING ITS POLICE DEPARTMENT,

      Defendants.

---

**COMPLAINT**

---

      Plaintiffs, Ruthie Jordan, Mary Patricia Graham-Kelly and the Colorado Cross-Disability

Coalition ("CCDC"), by and through their attorneys, Kevin Williams and Andrew Montoya of

the Colorado Cross-Disability Coalition Legal Program, hereby bring this Complaint against

Patrick Firman, in his official capacity as the Sheriff[1] of the City and County of Denver, the City

---

[1] In this case, the word "Sheriff," whether in reference to the Sheriff of Denver County, Colorado or the Sheriff of Jefferson County, Colorado, includes all programs, services and activities of the Sheriffs' Departments or Offices, *see, e.g.,* Colo. Rev. Stat. § 30-10-501 *et seq.,* the actions and/or inactions taken by all agents and individuals working for those Sheriffs' Departments or Offices, including without limitation the receipt of federal financial assistance. *See* Denver Sheriff Dept. Homepage, https://www.denvergov.org/content/denvergov/en/sheriff-department.html (last visited May 15, 2018) (describing programs, services and activities of the Denver, Colorado Sheriff's Department); and Jefferson County Sheriff's Dept. Homepage,

and County of Denver, Colorado, including its Police Department, and Jeff Shrader, in his

official capacity as the Sheriff of Jefferson County, Colorado.

## **INTRODUCTION**

1.      At least one lawsuit has also been brought against the Sheriff of Jefferson

County, Colorado for discrimination on the basis of disability before the instant lawsuit, alleging

that the Sheriff failed to have appropriate policies, practices and procedures that enable

individuals who are deaf to have effective communication in the Jefferson County Jail. *See*

*Orozco et al. v. Sheriff of Jefferson County, Colorado, Ted Mink, in his official capacity, et al.*,

Civil Action No. 10-cv-01934-DME-BNB (D. Colo. 2010).

2.      That lawsuit ended in a settlement in 2011. On information and belief, as a result

of a requirement of that settlement, the Sheriff of Jefferson County, Colorado changed its

policies, practices and procedures regarding providing interpreters to individuals who are deaf to

make them more consistent with the ADA.

3.      Nevertheless, the Sheriff of Jefferson County, Colorado continues to discriminate

against deaf and hard of hearing individuals as further explained in this Complaint, in violation

of the ADA and other statutes cited herein.

4.      At least one lawsuit has been brought against the Denver Sheriff's Department

and the Denver Police Department for discrimination on the basis of disability related to

individuals who are deaf before the instant lawsuit, specifically alleging that the Sheriff and

Police Department, along with others who operated the Denver County Jail, engaged in practices

---

http://jeffco.us/sheriff/ (last visited May 15, 2018) (describing programs, services and activities
of the Jefferson County, Colorado Sheriff's Office).

and procedures of the Sheriff, the Police Department and those operating the Denver County Jail resulting in the failure to accommodate individuals who are deaf. *See Ulibarri et al. v. City & County of Denver, et al*., Civil Action No. 07-CV-01814-WDM-MJW (D. Colo. 2007).

5.      On information and belief, the Sheriff of the City and County of Denver, Colorado has put in place policies and training regarding obtaining qualified sign language interpreters for individuals who are deaf that are designed to be consistent with the ADA.

6.      On information and belief, the Sheriff of the City and County of Denver, Colorado, has policies, procedures and training that are insufficient to comply with the ADA and other statutes cited herein, or the Sheriff did not follow its policies and training regarding obtaining qualified sign language interpreters for individuals who are deaf.

7.      The Denver Police Department created policies, practices and procedures to accommodate individuals who are deaf.

8.      Those policies include sections which read as follows, "The Denver Police Department must have available auxiliary aids and services for persons who are hearing impaired. Auxiliary aids and services include qualified interpreters computer aided notetaking, written materials in notepad and pen. The Department must give a hearing-impaired individual the opportunity to request the auxiliary aid or service of his or her choice and will give primary consideration to the expressed choice of the individual, unless it can be demonstrated that another effective means of communication exists or that use of the means chosen would result in undue financial and administrative burdens." In addition, "[a]ny time written communication is not effective, a qualified interpreter must be provided." "Interpreters for the hearing impaired are available on a 24-hour basis and may be requested through the Denver 911."

3

9.      In the *Ulibarri* case, the plaintiffs alleged the Sheriff, the Police Department and others operating the Denver County Jail failed to provide effective communication to a deaf inmate for an extended period of time, which was alleged to have resulted in that inmate committing suicide in his cell.

10.     That lawsuit concluded after a trial and a class action settlement in 2012.

11.     The City has a designated contact for providing sign language interpreting services. That individual is the Director of the Denver Office of Sign Language Services ("OSLS"), who, according to the Denver Police Department Training Bulletin, issued January 27, 2005, and reissued April 25, 2013, is to be contacted to arrange for sign language interpreters in non-emergency and emergency situations. At the times when the Director is unavailable, according to the Training Bulletin, the Denver Police Department is supposed to contact other interpreter referral agencies.

12.     Nevertheless, the Sheriff and the Police Department of the City and County of Denver, Colorado continue to discriminate against individuals who are deaf and hard of hearing as further explained in this Complaint in violation of the ADA and the other statutes cited herein.

13.     The ADA was enacted in 1990. The ADA (as do other laws that protect the rights of people with disabilities identified in this lawsuit that pre-date the ADA), requires that the Sheriffs and law enforcement agencies "take appropriate steps to ensure that communications for those who are deaf are as effective as communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis added). In addition, the Sheriffs and the Denver Police Department "shall furnish appropriate auxiliary aids and services where necessary to afford individuals [who are deaf], including applicants, participants, companions, and members of the public, an equal opportunity

4

to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). "Auxiliary aids and services" includes providing qualified sign language interpreters when the method of communication used by the individual is qualified interpreters, if the context of the communication is important. 28 C.F.R. § 35.160(b)(2). The Sheriffs and the Denver Police Department "shall give primary consideration to the requests of individuals [who are deaf] when determining the method of communication." *Id.*

14.   Ms. Jordan requested a sign language interpreter on multiple occasions with the Jefferson County Sheriff's deputies involved, the Denver Sheriff's deputies involved, and the Denver Police Department officers involved, but no sign language interpreter was made available by either entity.

15.   Ms. Jordan requested an American Sign Language interpreter during the service of process of documents.

16.   Ms. Jordan requested an American Sign Language interpreter when she was arrested after the Jefferson County Court proceedings.

17.   Ms. Jordan requested an American Sign Language interpreter during the booking and processing procedures at Jefferson County Jail and at the Denver Downtown Jail.

18.   Ms. Jordan requested an American Sign Language interpreter when she met with a public defender prior to her first court appearance while incarcerated in Denver County.

19.   Ms. Jordan requested and received an American Sign Language interpreter when she went to a civil hearing in Jefferson County that preceded the arrest by the Jefferson County Sheriff's deputies.

5

20.     Ms. Jordan requested an American Sign Language interpreter when she was arrested by the Jefferson County Sheriff's deputies, and she requested an American Sign Language interpreter when she went through the booking process and was held at the Jefferson County Detention Facility.

21.     Ms. Jordan requested an American Sign Language interpreter when she went through the booking process and was held at the Van Cise-Simonet Denver Downtown Detention Center ("Denver Downtown Jail").

22.     Ms. Jordan requested an American Sign Language interpreter when she was going through the procedure of being released from the Denver Downtown Jail.

23.     Ms. Graham-Kelly also requested an American Sign Language interpreter when she was arrested, booked and held by Sheriff Shrader and his agents, including while in her home when the deputies first arrived.

24.     Arrests, detention, bookings, and meetings with public defenders and Court proceedings are programs, services and activities provided by the Sheriffs and the Denver Police Department.

25.     Arrests, detention, and bookings are serious incidents that require effective communication. *See* Colo. Rev Stat. § 13-90-204(1).

26.     In this case, despite Ms. Jordan's specific requests for sign language interpreters and videophones, the Sheriff of Jefferson County, Colorado, the Denver Police Department and the Sheriff of City and County of Denver, Colorado failed to provide Ms. Jordan with a sign language interpreter or any other methods of communication that were effective.

6

27. Similarly, despite Ms. Graham-Kelly's specific requests for sign language interpreters, the Sheriff of Jefferson County, Colorado failed to provide her with a sign language interpreter or any other methods of communication that were effective.

28. In this case, the Sheriffs and the Denver Police Department failed to follow the policies, practices and procedures they were required to put into place as a result of the statutes at issue even after the settlements of the prior lawsuits addressing the same issues.

29. CCDC is a non-profit organization that advocates on behalf of individuals with all types of disabilities and seeks social justice on their behalf.

30. CCDC has been involved in litigation with the Sheriff of Jefferson County, Colorado in the *Orozco* lawsuit referenced above.

31. CCDC has also been involved in litigation with the Sheriff of the City and County of Denver, Colorado and the City and County of Denver, including its Police Department previously, including the *Ulibarri* lawsuit referenced above.

32. CCDC has also litigated similar issues against other Sheriffs and law enforcement agencies throughout Colorado because they failed to provide effective communication to individuals who are deaf. These include the Sheriff of Adams County, Colorado; the Sheriff of Arapahoe County, Colorado; the Englewood, Colorado Police Department; the Sheriff of Pueblo County, Colorado; the Pueblo Police Department; the Castle Rock, Colorado Police Department; the Sheriff of Boulder County, Colorado; the Longmont, Colorado Police Department; the Sheriff of Larimer County, Colorado and the Sheriff of Douglas County, Colorado.

33.     CCDC has also spent time and resources gathering information from Sheriffs' departments in counties throughout Colorado regarding their policies, practices and procedures concerning providing effective communication to people who are deaf.

34.     CCDC seeks to bring public attention to and to educate the public on the discrimination that individuals who are deaf have faced as a result of law enforcement agencies' failure to accommodate individuals who are deaf. CCDC's Legal Program has received media attention because of these lawsuits filed on behalf of individuals who are deaf who did not receive sign language interpreters and other forms of effective communication by law enforcement agencies.

35.     The United States Department of Justice ("DOJ"), through the Attorney General, is the agency charged with implementing the regulations under the ADA, enforcing the ADA and providing the public with education and guidance regarding the ADA, *see* 42 U.S.C. §§ 12133 & 12134; *see also* 28 C.F.R., pt. 35, §§ 28 C.F.R. §§ 35.101-999, has posted easily accessible information regarding the duties of law enforcement agencies and individuals who are deaf. *See, e.g.* "Communicating with People Who Are Deaf or Hard of Hearing ADA Guide for Law Enforcement Officers." *See* https://www.adagov/lawenfcomm.htm (Jan. 2006). "Model Policy For Law Enforcement On Communicating With People Who Are Deaf Or Hard Of Hearing." *See* https://www.ada.gov/lawenfmodpolicy.htm (Jan. 2006). These documents have been available online since before the previous lawsuits against the Sheriff of the City and County of Denver, the Denver police and Jefferson County referenced in this lawsuit were filed.

36.     The DOJ and other United States attorneys have worked with CCDC in the past to resolve law enforcement cases in which law enforcement agencies have failed to provide

interpreters and other appropriate auxiliary aids and services to individuals who are deaf. *See, e.g.,* "Justice Department Reaches Settlement with Two Colorado Law Enforcement Agencies to Improve Communication with People Who Are Deaf or Hard of Hearing," https://www.justice.gov/opa/pr/justice-department-reaches-settlement-two-colorado-law-enforcement-agencies-improve (Mar. 21, 2013).

37.     According to the website for the Jefferson County Sheriff's Office[2], "Under [Sheriff Shrader's] leadership, the Sheriff's Office enforces the law, investigates crimes and runs the county jail, which may hold as many as 1,280 inmates." It continues: "Under his leadership, the Sheriff's Office enforces the law, investigates crimes and runs the county jail, which may hold as many as 1,280 inmates. . . . Sheriff Shrader's law enforcement career began in 1984 as a deputy assigned to the county jail." According to the website, Sheriff Shrader has held numerous positions since that time with the Jefferson County Sheriff's Office, including without limitation, overseeing operations including the Patrol Division, Criminal Investigations Division, Detentions Services Division and the Support Services Division.[3] The website also informs that Sheriff Schrader is a past team-leader assessor for the Commission on Accreditation for Law Enforcement Agencies. Assuming the assertions made in this website are true and accurate, Sheriff Shrader would have been an employee of the Jefferson County Sheriff during the time of the *Orozco* lawsuit.

---

[2] Sheriff Jeff Shrader, http://jeffco.us/sheriff/about/sheriff-biography/ (last visited May 16, 2018).

[3] *Id.*

38.    According to the Denver Sheriff Department's website, and a Denver Post article,[4] Sheriff Firman spent over two decades working inside jails in two sheriffs' departments in suburban Chicago, Illinois. He never worked as a patrol officer, instead focusing on the care and management of inmates. According to the article, Sheriff Firman was quoted as saying, "I'm a jail guy," he said. "That's my passion."

## JURISDICTION AND VENUE

39.    This action arises under the Constitution and laws of the United States and the State of Colorado. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 and 28 U.S.C. § 1367(a), which permits supplementary jurisdiction over state law claims.

40.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as all of the events giving rise to the claims occurred in Colorado.

## PARTIES

41.    Plaintiff Ruthie Jordan is currently and at all times relevant to this suit has been a resident of the State of Colorado. Ms. Jordan is an individual with a disability as she is deaf and is thus substantially limited in the major life activity of hearing.

42.    Ms. Jordan is a member of CCDC.

---

[4] *See* About The Denver Sheriff Department, https://www.denvergov.org/content/denvergov/en/sheriff-department/about.html (last visited May 15, 2018); *see also* Noelle Phillips, "Denver sheriff getting down to business after six months in office," The Denver Post (May 29, 2016), http://www.denverpost.com/2016/05/29/denver-sheriff-getting-down-to-business-after-six-months-in-office/.

10

43.    Plaintiff Mary Patricia Graham-Kelly is currently and at all times relevant to this suit has been a resident of the State of Colorado. Ms. Graham-Kelly is an individual with a disability as she is deaf and is thus substantially limited in the major life activity of hearing.

44.    Ms. Graham-Kelly is a member of CCDC.

45.    Plaintiff CCDC is a 501(c)(3) non-profit membership organization whose members are persons with disabilities, including individuals who are deaf, and their nondisabled allies.

46.    Defendant Sheriff Shrader was sworn into office as the Sheriff of Jefferson County, Colorado in January 2015 and is serving pursuant to Part 5, Article 10, Title 30, Colorado Revised Statutes. Sheriff Shrader also serves as the custodian of the Jefferson County Detention Center. Colo. Rev. Stat. § 30-10-511. Sheriff Shrader is sued in his official capacity as the Sheriff of Jefferson County, Colorado.

47.    On information and belief,  Defendant Sheriff Shrader is a recipient of Federal financial assistance as that term is used in Section 504, 29 U.S.C. § 794 ("Section 504").

48.    Defendant Sheriff Shrader is a public entity. 42 U.S.C. § 12131(1).

49.    Defendant, Sheriff Firman, is the Sheriff of Denver County, Colorado, appointed by Mayor Michael B. Hancock in 2015. Sheriff Firman serves as the custodian of the Denver County Jail and the custodian of the Denver Downtown Jail.[5] Colo. Rev. Stat. § 30-10-511; *see also* Denver Sheriff Department website, https://www.denvergov.org/content/denvergov/en/sheriff-department.html (last visited May 16,

---

[5] The Denver Downtown Jail is distinguished from the Denver County Jail, located at 10500 Smith Rd., Denver, CO 80239. All references to the Denver Downtown Jail are to the Van Cise-Simonet Denver Downtown Detention Center, located at 490 West Colfax Ave., Denver, CO 80204.

2018) (the operations of the Denver Sheriff Department include two separate jails). Sheriff Firman is sued in his official capacity as the Sheriff of the City and County of Denver, Colorado).

50.    Sheriff Firman is a recipient of Federal financial assistance as that term is used in Section 504.

51.    Defendant Sheriff Firman is a public entity. 42 U.S.C. § 12131(1).

52.    Defendant City and County of Denver ("City") is a home rule municipality under Article XX, § 6 of the Colorado Constitution. As such, it is a public entity as that term is used in Title II of the ADA. 42 U.S.C. § 12131 *et seq*. The City's Police Department is one of the programs, services and activities the City provides to the public. 29 U.S.C. § 794(b).

53.    The City is a public entity. 42 U.S.C. § 12131(1).

54.    The City is a recipient of Federal financial assistance.

## FACTUAL ALLEGATIONS

55.    Ms. Jordan has been deaf since birth and uses American Sign Language ("ASL") as her primary means of communication.

56.    ASL is not English. It is a different language, using different syntaxes and other features that are not similar to the English language.

57.    Ms. Jordan was served by a Jefferson County Sheriff's deputy with a summons and demand to appear in court in Jefferson County on May 19, 2016, based on a warrant from Denver County. Ms. Jordan was not provided with an interpreter during the course of the service of process despite her multiple requests using handwritten notes.

58.    On information and belief, the deputies who attempted to serve Ms. Jordan were aware she is deaf.

59.    The warrant that led to Ms. Jordan's arrest stated that Ms. Jordan, upon whose written statement Denver Police Officer Gallegos relied (after preparing the affidavit for the warrant) was "hearing impaired." The documents provided to Ms. Jordan informed her that she was to appear in Jefferson County Court for a civil matter on May 19, 2016.

60.    Ms. Jordan appeared for a civil hearing in court in Jefferson County on May 19, 2016.

61.    On information and belief, the civil hearing was ordered to be rescheduled to a different day.

62.    An interpreter, who, on information and belief, is named Simon, was present and provided sign language interpreting during the course of the hearing for Ms. Jordan.

63.    At the conclusion of the May 19, 2016 hearing, Ms. Jordan understood she was free to leave as the hearing was rescheduled for a different day.

64.    Instead, after her hearing, Ms. Jordan was arrested by Jefferson County Sheriff's deputies. Despite her efforts to communicate to the Jefferson County Sheriff's deputy who arrested her that she needed to be handcuffed in front so she could attempt to communicate using an interpreter or notes if that was her only option, the deputy cuffed her hands behind her back, making it impossible for her to communicate in any way.

65.    No exigency existed at the time of Ms. Jordan's arrest.

66.    Although Ms. Jordan was taken into custody by the Jefferson County Sheriff, she was not provided any Miranda warning.

67.    Ms. Jordan was booked and held at the Jefferson County Detention Facility overnight. During the booking procedure, the sign language interpreter who was provided in the prior Jefferson County Court hearing accompanied Ms. Jordan to the booking area, but he had to leave for another appointment shortly thereafter. Ms. Jordan was told that the interpreter, Simon, was only scheduled for two hours. While Ms. Jordan was handcuffed with her hands behind her back, she was unable to communicate. Ms. Jordan was left unaware of what was happening during the remainder of the booking procedure and was not advised of the reason for her arrest.

68.    After Ms. Jordan was handcuffed by the Jefferson County Sheriff's deputy, she was taken to another room where they took off the handcuffs and searched her. They then put the handcuffs back on with her hands behind her back and took her downstairs. The deputies tried to talk to her and ask her questions, but she kept trying to show them that she did not understand.

69.    During the booking process, there was a video tape playing regarding procedures in the jail, but Ms. Jordan did not understand what it was for. On information and belief, the video may have contained information concerning procedures in the jail, and the video uses a sign language interpreter to provide that information. That video was, on information and belief, part of the earlier settlement between CCDC and the Jefferson County Sheriff. The video was difficult for her to see and understand. On information and belief, the video uses transliteration, a different form of sign language communication, and not ASL. Ms. Jordan did not understand many of the words used in the video.

70.    During her booking, once she was taken to the women's area common room, Ms. Jordan noticed that there were two videos playing in the booking room. The second video, on information and belief, is provided for hearing inmates to explain the booking and jail processes.

The video with sign language interpreting was much longer than the video that is believed to be for hearing inmates. Ms. Jordan remembers more of the video believed to be designed for hearing inmates because it provided a visual tour of the jail facilities. The other video with the sign language interpreter did not.

71.    At some point during her interactions with the Jefferson County Sheriff, Ms. Jordan was informed that she would have a court date on May 24, 2016. Ms. Jordan thought that she was going to be kept in jail until May 24, 2016. These communications all occurred through handwritten notes with another inmate, Heather, acting as a liaison between Ms. Jordan and the jail staff.

72.    Ms. Jordan was instructed by a Jefferson County Sheriff's deputy through handwritten notes to change her clothes.

73.    On information and belief, other procedures occurred at the Jefferson County Detention Center, and the only form of communication used with Ms. Jordan was handwritten notes.

74.    After her booking, the Jefferson County Sheriff gave Ms. Jordan a turkey sandwich to eat, but Ms. Jordan is a vegetarian. Because there was no effective communication, Ms. Jordan was not able to communicate that she needed a vegetarian meal.

75.    Ms. Jordan was taken by a Jefferson County Sheriff's deputy to a holding cell for 5 to 6 hours. She was not provided with an interpreter. Any communication with deputies was done in writing, which was not effective for Ms. Jordan.

76.    Eventually, Ms. Jordan was taken by a Jefferson County Sheriff's deputy to a jail cell where she was placed with ten other people. One of the individuals was designated as a

15

"lead" for the rest of the inmates. Any communication Ms. Jordan had with that individual was by handwritten notes.

77.    At the Jefferson County Detention Facility, operated by the Jefferson County Sheriff, Ms. Jordan was provided with a form entitled "Deaf/Hard of Hearing Inmate Communication Preference." Underneath that title, the form reads "Your Choice. Which One?" Below that are three pictures and underneath each respectively other words "Sign Language Interpreter," "Writing," and "Assistive Listing Device." Ms. Jordan circled "Sign Language Interpreter" and wrote "ASL" on the form. Despite this request, the Jefferson County Sheriff did not provide an interpreter during the majority of the booking process.

78.    At the Jefferson County Detention Facility, Ms. Jordan was provided a form entitled "Phone Preference." Underneath that title, the form reads, "Your choice. Which one?" The form had pictures on it. Underneath each of the pictures respectively are the words "Amplified Headset," "TTY," "Video Phone," and "Captioned Phone." Ms. Jordan circled "Video Phone." Despite her requests to use a video phone, none was provided. This form was signed by Ruthie Jordan and another individual, identified as "Captain" on May 20, 2016.

79.    On information and belief, through handwritten notes, the Jefferson County Sheriff offered Ms. Jordan the use of a TTY machine, but Ms. Jordan tried to explain through the use of handwritten notes that the TTY machine would not be an effective form of communications she needed to make.

80.    Ms. Jordan needed to contact her place of employment to let them know she would not be available. Through handwritten notes, Ms. Jordan tried to convey this message to the Jefferson County Sheriff's deputies. The Jefferson County Sheriff did not make available Ms.

16

Jordan's primary request for telecommunications, a video phone, and did not provide an effective means for Ms. Jordan to contact her place of employment.

81.    Through handwritten notes, Ms. Jordan also requested that she be able to contact her therapist who would be able to reach others with whom she needed to communicate.

82.    Through handwritten notes, Ms. Jordan was informed by the Jefferson County Sheriff's that phone calls would be made on her behalf.

83.    The previous settlement agreement with the Sheriff of Jefferson County required that the Sheriff would make video-phone relay service available for deaf inmates.

84.    On information and belief, the requested phone calls were not made by the Jefferson County Sheriff's deputies.

85.    If phone calls were made, no one made Ms. Jordan aware of that fact.

86.    The Jefferson County Sheriff provided Ms. Jordan with a form entitled "DEAF/HARD OF HEARING." The form shows a date of May 19, 2016.

   a.    On that form, there is a question that asks, "Can you read and write the English language?" Ms. Jordan put an X next to the word "No."

   b.    The next question asks, "Is English your first language?" Ms. Jordan put an X next to the word "No."

   c.    The next question asked, "What percentage of your hearing is impaired?" Next to the words "Left Ear," Ms. Jordan wrote "100%." Ms. Jordan also wrote next to the words "Right Year" the answer "100%."

   d.    The next question asks, "Can you read lips?" Ms. Jordan put an X next to the word "No."

17

e.     The next question asks, "Do you communicate through American Sign Language (ASL)?" Ms. Jordan put an X next to the word "Yes."

f.     The next question asks, "What is your preferred method of Communication?" Ms. Jordan wrote the words "ASL LIVE INTERPRETER."

g.     The next question asks, "Do you require any auxiliary aids or services?" Ms. Jordan put an X next to the word "No." Ms. Jordan did not know what the meaning of "auxiliary aids and services" was.

h.     The next question asks, "Is there anything we can do to assist you while you are housed here?" Ms. Jordan wrote, "LIVE INTERPRETER."

87.     The form discussed in the preceding paragraph is signed by Ruthie Jordan and also bears a "Staff Signature" with an illegible name and the number 3159.

88.     Despite Ms. Jordan's obvious requests for an interpreter and the use of the videophone, the Jefferson County Sheriff did not provide her with either one during all times necessary during these proceedings.

89.     The Jefferson County Sheriff tried to enlist the use of another inmate of the jail to communicate with Ms. Jordan using a method of communication known as finger spelling. Ms. Jordan tried to communicate her objections to having an inmate involved in any communications and requested a certified interpreter. Ms. Jordan was unable to communicate with the inmate because the inmate had insufficient skills as an interpreter and did not use American Sign Language.

90.     No Video Relay Service ("VRS") or Video Call Computers were provided during the duration of Ms. Jordan's incarceration at the Jefferson County Jail  although the Inmate

18

Handbook for the Jefferson County Sheriff's Office claims that a deaf inmate may have access to those devices and Ms. Jordan provided handwritten information indicating that she preferred the use of a video phone.

91.     Through handwritten notes, Ms. Jordan requested access to the Internet to be able to contact her workplace, her roommate for the purpose of obtaining her telephone to get telephone numbers, her therapist, and the producer of a play with which Ms. Jordan was involved.

92.     Through handwritten notes, Ms. Jordan informed the Jefferson County Sheriff that the only way to reach the producer of the show with which she was participating was by email and she provided the name of the individual to contact and her email address. Ms. Jordan was never informed by the Jefferson County Sheriff if the Jefferson County Sheriff contacted the producer. Ms. Jordan was never provided the opportunity to email anyone regarding the fact that she would be unavailable and was being detained.

93.     Through handwritten notes, Ms. Jordan asked Jefferson County Sheriff's personnel whether the Jefferson County Sheriff had a video phone and in response, the Jefferson County Sheriff responded "No." On information and belief, the Jefferson County Sheriff indicated in paperwork that Ms. Jordan "refused" when asked if she needed to make any contacts.

94.     On information and belief, at the Jefferson County Detention Facility, Ms. Jordan met with medical personnel who made inquiries about Ms. Jordan's medical conditions without providing a sign language interpreter.

95.    Ms. Jordan can read and write some English, but because American Sign Language is her primary language, she is not fluent in English and does not understand a large amount of English communication.

96.    CCDC sent an authorization and release for records for Ms. Jordan to the Jefferson County Sheriff and a Colorado Open Records Act request/Colorado Criminal Justice Records Act request, asking for all files related to Ruthie Jordan and all records pertaining to the provision of sign language interpreters by the Jefferson County Sheriff. Notes that were written between the Sheriff and Ms. Jordan were not provided in response to either request.

97.    On May 20, 2016, Ms. Jordan was transported by the Denver Police from the Jefferson County Detention Facility to the Denver Downtown Jail. No interpreters were provided for this event.

98.    The Denver Police officer was holding a paper in front of her that she believed explained why they were arresting her. Other paperwork was provided, but Ms. Jordan did not understand what it said. Ms. Jordan believes the paperwork have the word "discovery" written on it.

99.    On information and belief, the Denver Police Department and the Denver Sheriff knew that Ms. Jordan is deaf before the Denver Police arrived to transport her to the Denver Downtown Jail.

100.    On May 20, 2016, Ms. Jordan was booked into the Denver Downtown Jail. She was not provided with an interpreter for this process. Through handwritten notes, she specifically requested an interpreter for the booking.

101.    The City and County of Denver website concerning Inmate Processing[6] says the following:

> Upon intake, prisoners are searched, have a digital mugshot and right index fingerprint taken, are evaluated for medical and mental health issues by medical staff. Prisoner's property is inventoried and a thorough pat search (and metal detector search) of each prisoner is performed.  Fingerprint cards are sent to the CBI electronically. A check for any additional warrants is made when the fingerprints are classed and searched by the Denver Police Department Identification Bureau.
>
> The process time for an inmate to be booked into jail can vary. However, it usually takes between 2-6 hours to be fully processed through our intake system.

102.    When she arrived at the Denver Downtown Jail, by handwritten notes, Ms. Jordan once again requested an interpreter. Her request was denied or ignored.

103.    The Denver Sheriff deputies used handwritten notes to ask her to take out all the things her pockets and they took an inventory of everything she brought in. The deputies attempted to communicate with Ms. Jordan using handwritten notes even though she kept asking for an interpreter.

104.    On information and belief, all interactions with Denver personnel, with the exception of the arrest and transport, took place at the Denver Downtown Jail.

105.    During the booking process, a video explaining the booking process was playing, but Ms. Jordan was not made aware of its existence and did not realize it was there before the booking process began.

106.    During the booking process, there was an individual who, by typing back and forth on a computer, was asking medical questions of Ms. Jordan. Ms. Jordan. Ms. Jordan again

---

[6] Denver Sheriff Department Inmate Services, Inmate Processing, https://www.denvergov.org/content/denvergov/en/sheriff-department/services/inmate-services.html (last visited May 16, 2018).

21

requested an interpreter for the medical evaluation by typing her request. On information and belief, the document providing evidence of this communication was not saved. The medical staff person was writing notes on a word processor program and Ms. Jordan was not provided with a copy of the conversation.

107. Ms. Jordan still had not been provided with anything to eat.

108. Ms. Jordan was not informed that dinner was being served and so she still had nothing to eat.

109. Ms. Jordan attempted to request that the Denver Downtown Jail staff communicate with her by writing so she could inform them that she required a vegetarian meal, but the staff members looked at one another and chuckled before walking away without communicating with Ms. Jordan.

110. Ms. Jordan was held at the Denver Downtown Jail overnight. The deputies at the Denver Downtown Jail attempted to have another inmate communicate with Ms. Jordan using handwritten notes. Ms. Jordan objected to having another inmate provide communication to her and requested an interpreter. She was denied an interpreter at that time.

111. Through handwritten notes with the Denver County Sheriff, Ms. Jordan was informed that she would meet with a public defender and go to a court proceeding the either next day or the day after that.

112. Sometime later in the evening, Ms. Jordan believes around 9:45 p.m., an interpreter arrived. By this time, Ms. Jordan had fallen asleep and did not communicate much with the interpreter and was not told that an interpreter was coming. After speaking with the

interpreter, she finally found out what she had been charged with and why she was being held in jail.

113.    Ms. Jordan asked if the interpreter could stay with her until she was released. She was told the interpreter had to leave. The interpreter explained this; however, Ms. Jordan did not know if or when she would be released.

114.    At some point on May 20, 2016, by handwritten notes, Ms. Jordan explained to the deputies that she needed a video phone so she could tell her place of employment that she would not be able to be there. There was a videophone, but when Ms. Jordan was taken to use the videophone, the camera for the videophone had fallen off. The deputies did not know how to make the videophone and camera work. Ms. Jordan had to teach them how to use and fix the videophone.

115.    On May 21, 2016, Ms. Jordan met with a public defender, but no sign language interpreter was provided for this meeting. By handwritten notes, Ms. Jordan learned the purpose of the meeting was to discuss a court appearance that day for what she believed to be called a First Advisement and to address the issue of a personal recognizance bond. By handwritten notes, the public defender informed Ms. Jordan that she could either communicate with them using handwritten notes or wait until the following Monday or Tuesday to get an interpreter. May 21, 2016 was a Saturday. Ms. Jordan would have been forced to remain in jail all weekend if she waited for an interpreter, up to approximately five days. The handwriting between the public defender and Ms. Jordan did not provide effective communication for Ms. Jordan.

116.    After meeting with the public defender, Ms. Jordan was taken to court for her First Advisement. No interpreter was provided for this court proceeding. On information and belief, the court was aware that Ms. Jordan is deaf.

117.    On information and belief, all police officers involved in the arrest, booking and detention of Ms. Jordan were aware that she is deaf on May 20, 2016.

118.    Eventually, all charges against Ms. Jordan were dropped.

119.    Ms. Jordan was damaged and injured by the Defendants' violations of the laws as identified in this Complaint.

120.    Ms. Graham-Kelly was calmly waiting inside of her home the evening of January 1, 2017, when three Jefferson County Sheriff's deputies arrived.

121.    Ms. Graham-Kelly's daughter, who had called the Sheriff's office, explained to the operator that Ms. Graham-Kelly was deaf.

122.    When the deputies arrived at Ms. Graham-Kelly's home, they attempted to rely on her adult daughter, Sedona, to interpret, but Sedona is not a qualified sign language interpreter, and it was inappropriate to ask her to interpret under the circumstances.

123.    Ms. Graham-Kelly refused to rely on Sedona to interpret, and asked that her daughter wait outside given their close familial relationship.

124.    As documented in Deputy Kyle Coburn's report, Ms. Graham-Kelly wrote to Deputy Cody Erickson: "ADA law requires you to provide interpreter – I can wait. I don't want to use my family bec[ause] of legal issues[.]"

125.    Deputy Coburn's report continues: "Although Mary did not wish to use her daughter Sedona as a translator I did request her to translate for Mary. I had her explain to Mary

she was under arrest . . . I had Sedona explain the booking process and when she would see a judge as well as the temporary restraining order which would be put in place."

126.    Despite Ms. Graham-Kelly's clear request, the deputies did not provide her with a qualified sign language interpreter or other appropriate auxiliary aids or services.

127.    No exigency existed at the time of Ms. Graham-Kelly's arrest.

128.    Ms. Graham-Kelly's hands were cuffed behind her back, rendering her unable to use them for communication, and she was placed under arrest.

129.    Ms. Graham-Kelly was not read her Miranda rights by the deputies that placed her under arrest.

130.    Ms. Graham-Kelly was then removed from her home and placed into one of the deputies cruisers and transported to the Jefferson County Detention Facility.

131.    During Ms. Graham-Kelly's booking, she was approached by a Deputy Caitlin Reeves, who, on information and belief, knew some sign language.

132.    Deputy Reeves is not a qualified sign language interpreter, and was unable to communicate effectively with Ms. Graham-Kelly in ASL.

133.    According to Deputy Reeves' report from that interaction: "I was called by the booking deputy to translate booking intake questions in American Sign Language for an incoming inmate . . . . The intake questions were all medical related and due to the language barrier, the words specifically asked on the intake sheet are not defined in the American Sign Language dictionary, so I asked Mary to read each question herself on the intake sheet and answer accordingly."

134.    A qualified sign language interpreter could have interpreted the questions on the intake sheet into American Sign Language.

135.    Deputy Reeves attempted communication for only approximately fifteen minutes and focused solely on the intake questions discussed in her report.

136.    Ms. Graham-Kelly was not provided with a form to indicate her preferred form of auxiliary aid or service until booking was completed.

137.    Ms. Graham-Kelly was ultimately held overnight at the Jefferson County Detention Facility, but was never provided with a qualified sign language interpreter or other appropriate auxiliary aids or services by the Jefferson County Sheriff's agents.

138.    Ms. Graham-Kelly was not provided with a sign language interpreter for her court hearing the morning following her arrest, on information and belief, because the Jefferson County Sheriff's agents failed to inform the court of the need for an interpreter.

139.    A couple of months later, at approximately 8:00 p.m. on February 20, 2017, Ms. Graham-Kelly received a text message from Jefferson County Sheriff's Deputy Chad Fleming indicating that he would like to speak with her.

140.    Ms. Graham-Kelly promptly called Deputy Fleming back, using her videophone, to see what he wanted to discuss.

141.    Deputy Fleming asked Ms. Graham-Kelly whether she would be home for the remainder of the evening so he could speak with her in person, which Ms. Graham-Kelly confirmed she would be and would wait for Deputy Fleming.

142.    Deputy Fleming knew that Ms. Graham-Kelly is deaf.

26

143.    At approximately 10:00 p.m., Deputy Fleming appeared at Ms. Graham-Kelly's residence where he placed her under arrest.

144.    Deputy Fleming cuffed Ms. Graham-Kelly's hands behind her back and transported her to the Jefferson County Detention Facility.

145.    Once again, Ms. Graham-Kelly was booked and held at the Jefferson County Detention Facility overnight without a qualified sign language interpreter or any other appropriate auxiliary aids or services.

146.    Ms. Graham-Kelly also sought to use the videophone to contact her roommate, but none of the videophones she was provided with worked. Ms. Graham-Kelly attempted to troubleshoot the videophone with a Sorenson representative, who informed her that the videophones needed their software updated to work.

147.    Ms. Graham-Kelly was ultimately released the on February 22, 2017, without having been provided appropriate auxiliary aids or services during her arrest or detention.

148.    On information and belief, Ms. Graham-Kelly could have been released on February 21, 2017, but she was unable to contact anyone outside of the jail due to the malfunctioning videophones, resulting in her remaining in jail for an additional night.

149.    CCDC is a nonprofit organization whose mission it is to advocate for social justice for people with all types of disabilities.

150.    As part of that mission and purpose, CCDC expends time and resources devoted to activities such as education and other forms of non-legal advocacy.

151.    CCDC's mission and purpose have been frustrated by Defendants' discrimination.

152.    CCDC has had to divert resources to combat the discrimination in this case.

27

153. The interests CCDC seeks to protect in this lawsuit are germane to the organization's purpose.

154. Neither the claims asserted nor the relief requested requires the participation of individual CCDC members in the lawsuit.

155. CCDC's membership consists of individuals who are deaf.

156. Members of CCDC who are deaf live and work in the City and County of Denver and Jefferson County.

157. Members of CCDC who are deaf are likely to encounter Denver and Jefferson County Sheriff deputies and Denver Police and not be provided with American Language Interpreters when necessary to afford effective communication that is as effective as communication provided to hearing individuals.

158. Language used during discussions with law enforcement agencies, by definition, often involve important exchanges of information that require certainty with respect to the information given in the information received.

159. Because Defendants do not have appropriate policies and procedures in place and/or Defendants do not put appropriate policies and procedures into practice, CCDC members who are deaf who encounter Defendants are likely to experience the same discrimination as Plaintiff Jordan and the other individuals who are deaf who were alleged to be subjected to discrimination in me cases filed against these Defendants by individuals who are deaf previously.

160. Plaintiffs, and other individuals who are deaf, including members of CCDC, have been harmed, and will continue to be harmed by Defendants' discriminatory policies, practices, and procedures, and/or by the lack of appropriate or sufficient training regarding their obligation

to provide appropriate auxiliary aids and services to individuals who are deaf and/or the failure of Defendants to abide by their policies, practices and procedures pertaining to providing sign language interpreters to the deaf as required under the statutes at issue in this case.

## FIRST CLAIM FOR RELIEF
(Against All Defendants for violations of Title II of the ADA)

161.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

162.    Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

163.    Public entities are defined as "any State or local government; [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(A)-(B).

164.    Defendant Sheriff Shafer is a public entity within the meaning of the Title II of the ADA.

165.    Defendant City, including its Police Department, is a public entity within the meaning of the Title II of the ADA.

166.    Defendant Sheriff Firman is a public entity within the meaning of the Title II of the ADA.

167.    Ms. Jordan is a qualified individual with a disability. *See* 42 U.S.C. § 12131(2).

168.    Ms. Graham-Kelly is a qualified individual with a disability. *Ibid*.

169.    As described in this Complaint, Defendants failed to take appropriate steps to ensure that communications with Ms. Jordan were as effective as communications with others who are not deaf. 28 C.F.R. § 35.160(a)(1).

170.    As described in this Complaint, Defendants failed to furnish appropriate auxiliary aids and services that were necessary to afford Ms. Jordan an equal opportunity to participate in and enjoy the benefits of Defendants' services, programs and activities. 28 C.F.R. § 35.160(b)(1).

171.    The following are programs, services and activities provided by the Jefferson County Sheriff, the City, including its Police Department and the Denver City and County Sheriff:

   a.   Service of process;

   b.   arrest;

   c.   booking and processing of inmates;

   d.   assignment of housing at detention facilities;

   e.   procedures related to detention of inmates;

   f.   questioning of individuals who are placed under arrest, including questioning regarding medical conditions;

   g.   transportation of individuals who are under arrest;

   h.   contacting public defenders when individuals have a disability and need auxiliary aids and services;

   i.   notification of courts when individuals have a disability and need auxiliary aids and services;

30

j.  release procedures related to personal recognizance bonds and other forms of bonds.

172.  As described in this Complaint, Defendants failed to give primary consideration to the requests of Ms. Jordan with respect to the types of auxiliary aids and services she requested. 28 C.F.R. § 35.160(b)(2).

173.  As described in this Complaint, Defendants attempted to have other adult individuals who are not qualified interpreters interpret for Ms. Jordan in violation of 28 C.F.R. §§ 35.160(c)(1) & (2).

174.  Defendants failed to provide Ms. Jordan with effective telecommunications systems that were equal to those provided to individuals who are not deaf. 28 C.F.R. § 35.161(a).

175.  Defendants were required to make reasonable modifications to their policies, practices and procedures when the modifications are necessary to avoid discrimination on the basis of disability unless they can show that doing so would fundamentally alter the nature of the service, program or activity. 28 C.F.R. § 38.130(b)(7)(i).

176.  Defendants have discriminated against Ms. Jordan on the basis of her disability.

177.  Defendant Shrader failed to take appropriate steps ensure that communications with Ms. Graham-Kelly were as effective as communications with others who are not deaf. 28 C.F.R. § 35.160(a)(1).

178.  Defendant Shrader failed to furnish appropriate auxiliary aids and services that were necessary to afford Ms. Graham-Kelly an equal opportunity to participate in and enjoy the benefits of Defendant's services, programs and activities. 28 C.F.R. § 35.160(b)(1).

31

179. Defendant Shrader failed to give primary consideration to the requests of Ms. Graham-Kelly with respect to the types of auxiliary aids and services she requested. 28 C.F.R. § 35.160(b)(2).

180. Defendant Shrader attempted to have others in the detention facility who are not qualified interpreters interpret for Ms. Graham-Kelly in violation of 28 C.F.R. §§ 35.160(c)(1) & (2).

181. Defendant Shrader's deputies relied on Ms. Graham-Kelly's daughter to interpret when she was arrested, despite her specific request that her daughter not be used due to their close familial relationship in violation of 28 C.F.R. § 35.160(c)(2).

182. Defendant Shrader failed to provide Ms. Graham-Kelly with effective telecommunications systems that were equal to those provided to individuals who are not deaf. 28 C.F.R. § 35.161(a).

183. Defendant Shrader failed to provide Ms. Graham-Kelly with effective telecommunications systems that were equal to those provided to individuals who are not deaf. 28 C.F.R. § 35.161(a).

184. Specifically, the Jefferson County Sheriff offered Ms. Graham-Kelly the use of a telecommunications device that did not function properly.

185. Handwritten notes were not an effective method of communication for Ms. Graham-Kelly.

186. Defendant Shrader was required to make reasonable modifications to his policies, practices and procedures when the modifications are necessary to avoid discrimination on the basis of disability unless he can show that doing so would fundamentally alter the nature of the

32

service, program or activity. 28 C.F.R. § 38.130(b)(7)(i). To the extent that Defendant Shrader failed to allow Ms. Graham-Kelly to contact outside entities using a cell phone or computer, he violated this regulation.

187.    Defendants have discriminated against Ms. Graham-Kelly on the basis of her disability.

188.    Plaintiffs Jordan, Graham-Kelly and CCDC have been and will continue to be injured, damaged and aggrieved by Defendants' discrimination.

189.    In the absence of appropriate and enforced policies, practices and procedures, Ms. Jordan, Ms. Graham-Kelly and other CCDC members who are deaf will be subjected to discrimination by Defendants on the basis of their disabilities, including Defendants' failures to provide appropriate auxiliary aids and services and failures to ensure effective communication that is equal to that provided to others who are not deaf.

190.    In the absence of the injunction requested herein, Plaintiffs will continue to be injured, damaged and aggrieved by Defendants' discrimination.

191.    Defendants have demonstrated that even in the face of prior lawsuits for failing to provide effective communication to individuals who are deaf and a resulting settlement agreement with policy changes requiring compliance with the ADA, Defendants will nevertheless discriminate against individuals who are deaf.

192.    According to the Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services Originally Published July 26, 1991:

> The scope of title II's coverage of public entities is comparable to the coverage of Federal Executive agencies under the 1978 amendment to section 504, which extended section 504's application to all programs and activities "conducted by" Federal Executive agencies, in that title II applies to anything a public entity does.

33

Title II coverage, however, is not limited to "Executive" agencies, but includes activities of the legislative and judicial branches of State and local governments. All governmental activities of public entities are covered, even if they are carried out by contractors.

28 C.F.R. pt. 35, app. B (2011) (analysis of Section 35.102 "Application").

193. Defendants, in providing any program, service or activity, may not, directly or through contractual or other arrangements discriminate against an individual on the basis of disability. 28 C.F.R. § 35.130(b)(1).

194. To the extent that Defendants relied on any other individuals or entities to provide programs, services or activities through contractual or other arrangements, Defendants discriminated against Ms. Jordan and Ms. Graham-Kelly.

195. Defendants acted intentionally and with a deliberate indifference for Plaintiffs' civil rights.

196. Defendants were all aware of their obligations with respect to providing communications to Ms. Jordan and Ms. Graham-Kelly that were as effective as communications with hearing people based on previous lawsuits against these entities.

197. Ms. Jordan suffered damages and injuries as a result of Defendants' violations of Title II.

198. Ms. Graham-Kelly suffered damages and injuries as a result of Defendant Shrader's violations of Title II.

199. CCDC suffered damages and injuries as a result of Defendants' violations of Title II.

**SECOND CLAIM FOR RELIEF**
(Against All Defendants for violations of Section 504)

34

200. The Plaintiffs incorporate the allegations set forth in the remainder of this

Complaint as if fully set forth herein.

201. Section 504 provides:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a); *see also* 28 C.F.R. § 41.51(a).

202. Defendants receive Federal financial assistance. *See, e.g.*, 28 C.F.R. § 42.540(f).

203. Ms. Jordan and Ms. Graham-Kelly are qualified handicapped persons.[7] 28 C.F.R.

§ 41.32(b).

204. Defendants' law enforcement and detention activities constitute the operation of

"a department, agency, special purpose district, or other instrumentality of a State or of a local

government[.]" 29 U.S.C. § 794(b)(1)(A).

---

[7] For purposes of the ADA and Section 504, the words "disability" and "handicapped" have the same meaning:

The use of the term "disability" instead of "handicap" and the term "individual with a disability" instead of "individual with handicaps" represents an effort by Congress to make use of up-to-date, currently accepted terminology. As with racial and ethnic epithets, the choice of terms to apply to a person with a disability is overlaid with stereotypes, patronizing attitudes, and other emotional connotations. Many individuals with disabilities, and organizations representing such individuals, object to the use of such terms as "handicapped person" or "the handicapped." In other recent legislation, Congress also recognized this shift in terminology, e.g., by changing the name of the National Council on the Handicapped to the National Council on Disability (Pub.L.100–630).

28 C.F.R. pt. 35, app. B (construing § 35.104 Definitions). *Compare* 42 U.S.C. § 12102 (definition of disability under the ADA) *with* 28 C.FR. §42.540(k) (Definition of "Handicapped Person" under Section 504).

205.    Unlawful discriminatory actions prohibited under Section 504 or through contractual or other arrangements under any program or activity receiving Federal financial assistance include:

    a.    "Deny[ing] a qualified handicapped person the opportunity afforded others to participate in the program or activity receiving Federal financial assistance [. . .];

    b.    "Deny[ing] a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program or activity receiving Federal financial assistance;" . . .

    c.    "Deny[ing] a qualified handicapped person in equal opportunity to participate in the program or activity by providing services[.]"

28 C.F.R. § 42.503(b)(1).

206.    Defendants violated 28 C.F.R. § 42.503(b)(1) as set forth in this Complaint.

207.    Defendants did not provide effective communication to Ms. Jordan that was equal to that afforded to hearing individuals.

208.    Defendant Shrader did not provide effective commission to Ms. Graham-Kelly that was equal to that afforded to hearing individuals.

209.    "A recipient [of Federal financial assistance] may not deny a qualified handicapped person the opportunity to participate in any program or activity receiving Federal financial assistance on the ground that other specialized aid, benefits, or services for handicapped persons are available." 28 C.F.R. § 42.503(b)(2).

36

210. Defendants denied Ms. Jordan and other individuals who are deaf the opportunity to participate in programs and activities receiving Federal financial assistance on the ground that other specialized aids, benefits, or services for deaf individuals were available.

211. Defendant Shrader denied Ms. Graham-Kelly and other individuals who are deaf the opportunity to participate in programs and activities receiving Federal financial assistance on the ground that other specialized aids, benefits, or services for individuals who are deaf were available.

212. "Any entity not otherwise receiving Federal financial assistance but using a facility provided with the aid of Federal financial assistance after the effective date of this subpart is prohibited from discriminating on the basis of handicap." 28 C.F.R. § 42.503(b)(6).

213. On information and belief, facilities used by Defendants have received Federal financial assistance at times relevant to this Complaint.

214. "Recipients [of Federal financial assistance] shall administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 42.503(d).

215. Defendants failed to administer programs or activities in the most integrated setting appropriate to the needs of Ms. Jordan and Ms. Graham-Kelly and individuals who are deaf.

216. "Recipients [of Federal financial assistance] <u>shall ensure that communications with their . . . beneficiaries are effectively conveyed to those having impaired . . . hearing</u>." 28 C.F.R. § 42.503(e) (emphasis added).

37

217. "A recipient [of Federal financial assistance] that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance." 28 C.F.R. § 42.503(f).

218. Each Defendant in this case employee fifteen or more persons.

219. Disability discrimination claims brought under Title II of the ADA and Section 504 are to be construed similarly. 28 C.F.R. § 35.103 (a) ("this part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973"); *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725-726 (10th Cir. 2011) (and cases cited therein).

220. Defendants discriminated against Ms. Jordan, and Defendant Shrader discriminated against Ms. Graham-Kelly by failing to implement and use policies, practices and procedures that would ensure individuals who are deaf are provided with qualified sign language interpreters.

221. Defendants failed to provide communication with Ms. Jordan and Ms. Graham-Kelly that were as effective as communication provided to hearing individuals.

222. Defendants were well aware of their obligations under Section 504 and breached those obligations.

223. Defendants acted intentionally and with deliberate indifference to Plaintiffs' civil rights.

38

224.    Ms. Jordan suffered damages and injuries as a result of Defendants' violations of Section 504.

225.    Ms. Graham-Kelly suffered damages and injuries as a result of Defendant Shrader's violations of Section 504.

226.    CCDC suffered damages and injuries as a result of Defendants' violations of Section 504.

## THIRD CLAIM FOR RELIEF

(Against All Defendants for violations of the Colorado Anti-Discrimination Act ("CADA") and State Law Claims)

227.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

228.    Ms. Jordan is a "qualified individual with a disability." Colo. Rev. Stat § 24-34-301(5.6) (this term "has the same meaning as set forth in the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12131, and its related amendments and implementing regulations.")

229.    Ms. Graham-Kelly is a "qualified individual with a disability." Colo. Rev. Stat § 24-34-301(5.6) (this term "has the same meaning as set forth in the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12131, and its related amendments and implementing regulations.")

230.    Defendants are all public entities. Colo. Rev. Stat § 24-34-301(5.4) (this term "has the same meaning as set forth in the federal "Americans with Disabilities Act of 1990", 42 U.S.C. sec. 12131, and its related amendments and implementing regulations.

231.    Defendants are all "persons." Colo. Rev. Stat § 24-34-301(5)(a) (the definition of "person" includes "the state of Colorado and all of its political subdivisions and agencies.").

39

232.    Ms. Jordan, Ms. Graham-Kelly and any individuals who are deaf who have been subjected to Defendants' failures to comply with the CADA are all qualified individuals with disabilities as that term is used in the CADA.

233.    Ms. Jordan, Ms. Graham-Kelly and all individuals with disabilities who have been subjected to failures of Defendants to comply with Part 8 of Article 24, Title 34, Colorado Revised Statutes as explained in this Complaint, are "qualified individual[s] with disabilities." Colo. Rev. Stat. § 24-34-301(5.6).

234.    Under Part 8 of the CADA, entitled "Persons with Disabilities -- Civil Rights:"

The general assembly declares that it is the policy of the state:

> (a) To encourage and enable individuals who are . . . hearing impaired . . . to participate fully in . . . activities in our state on the same terms and conditions as individuals without a disability;
>
> (b) That individuals who are . . . hearing impaired . . . have the same rights as individuals without a disability to the full and free use of [all] public facilities, and other public places;
>
> (c) That individuals who are . . . hearing impaired . . . are entitled to full and equal . . . privileges of all places to which the general public is invited [willingly or otherwise]; and
>
> (d) That individuals who are . . . hearing impaired . . . must not be excluded, by reason of his or her disability, from participation in or be denied the benefits of the services, programs, or activities of any public entity or be subject to discrimination by any public entity.

Colo. Rev. Stat. § 24-34-801(1).

235.    Under the CADA:

A qualified individual with a disability . . . who is subject to a violation of subsection (1) of this section or . . . 24-34-803 based on his or her disability may bring a civil suit in a court of competent jurisdiction and is entitled to any of the following remedies:

40

> (I)    A court order requiring compliance with the provisions of the applicable section;
>
> (II)    The recovery of actual monetary damages; or
>
> (III)    A statutory fine not to exceed three thousand five hundred dollars.

Colo. Rev. Stat. § 24-34-802(2)(a).

236.    Under the CADA, "[a] court that hears civil suits pursuant to this section shall apply the same standards and defenses that are available under the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations." Colo. Rev. Stat. § 24-34-802(4).

237.    "The Law concerning handicap and/or disability is substantially equivalent to Federal law, as set forth in the Americans with Disabilities Act, as amended, and the Fair Housing Act concerning disability." Colo. Code Regs. § 708-1:60.1.(A).

238.    Under Colorado law, it is a deceptive trade practice and unlawful to do the following:

> Claim [] to be a "sign language interpreter", "interpreter for the deaf", "deaf interpreter", "ASL-English interpreter", "American sign language (ASL) interpreter", "transliterator", "certified sign language interpreter", "certified interpreter for the deaf", "certified deaf interpreter", "certified ASL-English interpreter", "certified American sign language (ASL) interpreter", or "certified transliterator", unless he or she holds a current certification issued by the registry of interpreters for the deaf or a successor organization. A registry of interpreters for the deaf, or successor organization, membership card that shows proof of current membership and certification shall be made available for immediate inspection and review by any consumer or agent of the state of Colorado.

Colo. Rev. Stat. § 6-1-707(1)(e).

239.    Defendants, the Sheriffs, both attempted to use individuals who identified themselves as interpreters to act as interpreters in violation of the statute.

240.    As stated in this Complaint, Defendants failed to provide Ms. Jordan, Ms.
Graham-Kelly and individuals who are deaf with communication that was as effective as
communication with hearing persons.

241.    As stated in this Complaint, Ms. Jordan, Ms. Graham Kelly and individuals who
are deaf were damaged and injured by Defendants' conduct as outlined in this Complaint.

242.    CCDC has been damaged and injured by Defendants' conduct as outlined in this
Complaint.

**WHEREFORE, Plaintiffs respectfully request:**

1.    That this Court assume jurisdiction;

2.    That this Court declare the actions of Defendants described in this Complaint to
be in violation of Title II of the ADA, Section 504 and the CADA;

3.    That this Court enter an injunction ordering Defendants to cease discrimination on
the basis of disability against individuals who are deaf, establish and enforce compliance with
policies, practices and procedures that will ensure that they provide individuals who are deaf
with communication that is as effective as communication provided to hearing individuals in all
of their programs, services and activities;

4.    That this Court award Plaintiffs damages;

5.    That this Court award Plaintiffs' attorneys their reasonable attorneys' fees and
costs; and

6.    That this Court award such additional or alternative relief as may be just, proper,
and equitable.

JURY DEMAND: Plaintiffs request this case be heard by a jury.

42

Dated: May 18, 2018                    Respectfully submitted,

                                        *s/ Andrew C. Montoya*
                                        Andrew C. Montoya
                                        Kevin W. Williams
                                        Colorado Cross-Disability Coalition Legal Program
                                        1385 S. Colorado Boulevard, Suite 610-A
                                        Denver, CO 80222
                                        (303) 839-1775
                                        kwilliams@ccdconline.org
                                        amontoya@ccdonline.org

                                        Attorneys for Plaintiffs

43

Address of Ruthie Jordan:

4044 Parfet Street
Wheat Ridge, CO 80033

Address of Mary Patricia Graham-Kelly:

6470 Deframe Court
Arvada, CO 80004

Address of Colorado Cross-Disability Coalition:

Empire Park
1385 South Colorado Blvd., Suite 610-A
Denver, CO 80222